Filed 5/30/13  P. v. Villalpando CA4/3
Opinion following recall of remittitur and reinstatement of appeal

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G045028 |
| v. | (Super. Ct. No. 07NF4496) |
| RAUL VILLALPANDO, | O P I N I O N |
| Defendant and Appellant. | |

Motion to recall remittitur; appeal from a judgment of the Superior Court of Orange County, Francisco P. Briseno, Judge.  Motion granted.  Judgment affirmed in part and reversed in part.

R. Clayton Seaman, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Theodore M. Cropley, Deputy Attorneys General, for Plaintiff and Respondent.

\*      \*      \*

In our prior unpublished opinion, *People v. Warren* (June 18, 2012, G045028), we affirmed defendant Raul Villalpando's convictions for first degree murder, attempted robbery, and street terrorism, but reversed his conviction for conspiracy to commit attempted robbery. In addition, we affirmed the jury's special circumstance findings that Villalpando committed the murder during the commission of an attempted robbery and for a criminal street gang purpose, as well as the jury's enhancement findings he committed the murder and attempted robbery to benefit a criminal street gang. The California Supreme Court denied Villalpando's petition for review "without prejudice to any relief to which defendant might be entitled after [the Supreme Court] decides *People v. Rodriguez*, S187680."

Subsequently, the Supreme Court held in *People v. Rodriguez* (2012) 55 Cal.4th 1125 (*Rodriguez*) that the crime of active participation in a criminal street gang (often referred to as street terrorism)[1] requires the predicate felony to "be committed by at least two gang members, one of whom can include the defendant if he is a gang member." (*Rodriguez*, at p. 1132.) Based on *Rodriguez* (which constitutes new authority that is contrary to the California law on which we relied in our prior opinion), Villalpando moves this court to recall our remittitur, to reinstate his appeal, and to reverse his street terrorism conviction, his gang-related enhancements, and his gang-related special circumstance. Although the Attorney General agrees *Rodriguez* requires the reversal of Villalpando's street terrorism conviction, she argues *Rodriguez* has no bearing on the jury's gang enhancement and gang special circumstance findings.

An appellate court may order the recall of a remittitur for good cause (Cal. Rules of Court, rule 8.272(c)(2)), such as for an error of law that would entitle the

---

[1] The statute which governs the crime of street terrorism (Pen. Code § 186.22, subd. (a)) is part of the Street Terrorism Enforcement and Prevention Act (§ 186.20 et seq.). (*Rodriguez*, *supra*, 55 Cal.4th at pp. 1128, 1130, fn. 5.)
All statutory references in this opinion are to the Penal Code.

2

defendant to a writ of habeas corpus (*People v. Mutch* (1971) 4 Cal.3d 389, 396-397).  In the aftermath of *Rodriguez*, Villalpando stands convicted under an invalid theory of street terrorism, but the jury's true findings on the gang enhancements and gang special circumstance remain valid.  Accordingly, as to Villalpando only, we recall the remittitur, reinstate his appeal, issue this new opinion that supersedes our prior opinion as to Villalpando only, and order that a new remittitur issue.[2]  We again reverse Villalpando's conviction for conspiracy to commit attempted robbery, and, in addition, reverse his street terrorism conviction.  We affirm the judgment in all other respects.[3]

FACTS

*The Homicide and Attempted Robbery*

On the evening of December 8, 2007, Pedro Rubio drove to the home of his best friend, Warren, to take Warren shopping with him.  At Warren's apartment building, Rubio parked behind an SUV and phoned Warren.  Warren came downstairs, walked to the driver's side of the SUV parked in front of Rubio's car, and talked to the driver.  The driver handed Warren a cell phone.

Warren came over to Rubio's car and told Rubio he was going to go pick up some drugs.  Warren also said the people in the SUV were going to rob the drug dealer.  Warren then walked away and got in the SUV.

---

[2] Villalpando and Michael James Warren were charged in a single information, but were tried separately before different juries.  Our prior opinion encompassed both their appeals.  Because Warren has not moved for recall of the remittitur, our prior opinion remains final and in full effect as to him only.

[3] We have reconsidered our prior holdings only to the extent necessary to rule on the merits of Villalpando's claims based on *Rodriguez*.

Rubio followed the SUV on a five minute drive to an alleyway. The SUV and Rubio stopped just past the mouth of the alleyway. Warren got out of the SUV, came to Rubio's car, and told Rubio to park and wait there. Warren said he was going to phone his drug dealer and tell him to meet Warren outside; at that point, someone was supposed to rob the dealer while Warren ran away. The SUV drove forward. Warren made a phone call and walked down the alley.

Edgar Zarate, a drug dealer who was Warren's drug connection, lived at the corner of the alley with his wife, Brenda Curiel, and their infant child. Zarate had moved his family there a few weeks earlier because, at their former residence, he had been in a fight with some "cholos" that left Zarate bruised and bleeding and fearful for his family's safety.

On December 8, 2007, Curiel was in the house trying to get the baby to sleep. Zarate's cell phone rang. He told Curiel "it was Mike, the black guy." About two minutes later, Zarate went outside to meet Warren. (Curiel had seen Warren near their home on previous occasions, knew him to be "Mike," and knew that he often phoned Zarate.)

Curiel heard someone shout, "Edgar." Then Curiel (and Rubio in his car) heard two quick gunshots in succession. Curiel ran to the front of the house and saw Zarate lying face down on the floor in the house. She saw blood. Zarate later died of a single gunshot wound in the lower back.

About a minute after the shots were fired, Warren came "[r]unning really fast" to Rubio's car, got in the passenger side, and told Rubio to "go, go, just drive." Rubio "took off." Warren, acting scared, "said something went wrong, somebody got shot." Warren said it was not supposed to happen like that.

Rubio and Warren went to Warren's apartment. Five to ten minutes later, Villalpando arrived at Warren's apartment and introduced himself to Rubio as "Oso" from "Toker Town." Warren told Villalpando, "That wasn't supposed to happen. That

4

wasn't supposed to go down like that." Villalpando said, "I told you, if he ran, I was going to blast him." Warren asked if Villalpando "hit him." Villalpando replied, "I got him in the back." Villalpando and Warren argued about whose responsibility it was to get the money from Zarate. Warren told Rubio that no one got any money. Before Villalpando left Warren's apartment, Villalpando said, "If anybody asks, East Side Buena Park did it." East Side Buena Park is a rival street gang to Villalpando's gang, Fullerton Tokers Town (FTT). Rubio stated that to his knowledge, Warren was not a member of any gang. He further stated that he has never been identified as a gang member and does not hang out with or participate in the activities of FTT.

*Jail House Informant's Testimony*

John Paquette, a confidential informant with prior arrests for drug use, drug possession and felony evading, testified in Villalpando's trial. Paquette said he first met Villalpando in December 2007 or January 2008, when both men were in custody, handcuffed together, and in line to get on a transport bus to the local jail. With Paquette chained to him, Villalpando went to the front of the bus to talk with "black Mike," who Paquette later learned to be Michael Warren. Paquette knew Villalpando as "Oso." At the time, Paquette knew that a murder had occurred in Buena Park on December 8, 2007, because Paquette was supposed to meet a police officer on that date, but the officer did not show up due to the homicide. Paquette also believed Villalpando was a gang member based on an earlier incident when Pacquette was selling drugs at his auto repair shop and believed a group had planned to rob him.

On a date in January 2008, Paquette and Villalpando were in the same holding cell at the courthouse. They talked about their cases. Villalpando said he was in jail for murder. Later in the day, Villalpando said he was actually the shooter in the murder. Villalpando said his girlfriend and his cousin drove him to Zarate's house. Warren was supposed to lure Zarate out of his house so Villalpando could rob him. If

5

Zarate had seen Villalpando, Zarate would not have come out, since Villalpando was an FTT member and Zarate was from a rival gang, East Side Buena Park. Villalpando was wearing a Fullerton cap. Warren went to the door of Zarate's house and talked with Zarate. When Zarate saw Villalpando come around the corner from behind the bushes, Zarate ran back into his house toward the kitchen. Villalpando shot Zarate in the back. Zarate turned so that the next shot missed him and went into a refrigerator. A bullet was found underneath Zarate or on the floor.[4]

Villalpando was scared after the shooting so "everybody just split" and no one got any drugs or money. Villalpando ran to the car, threw the gun in the window, got in, and they took off. Warren ran down the alley to a waiting Navigator SUV. Warren sent a text message to Zarate after the shooting asking if he was okay. Villalpando claimed that he was going to blame Warren for the shooting.[5]

Paquette asked Villalpando if he felt bad about killing Zarate and not getting any drugs from him. Villalpando said Zarate "was dirty anyways" because he was testifying against someone in a murder case.

At the jail, Paquette was incarcerated in a cell with Villalpando's cousin who had the nickname "Slick" or "Nacho" and was a member of FTT. Villalpando believed Warren had been giving statements to the police. Villalpando wanted Paquette to tell Slick that Warren was "telling on him" and to send out a "green light" on Warren,

---

[4]     There is no explanation in the appellate record as to how Villalpando would have known that a bullet was found under Zarate or on the floor.

[5]     The detail with which Villalpando described the murder, while sitting with a stranger in a jail cell, is remarkable. The prosecutor, apparently recognizing that Paquette's account might, for that reason, appear implausible, asked him on redirect examination whether "it seem[ed] to [him] that Mr. Villalpando was bragging." Paquette answered, "Yes." Defense counsel objected to the question as calling for speculation; the objection was sustained, but counsel did not move to strike the answer.

meaning Warren should "be taken care of," for example, by beating down, stabbing, or even killing him. Paquette overheard Villalpando threaten Warren "that he needed to change his story, if necessary, and you know what happens if you don't follow along."

*Gang Evidence*

Around 10:15 p.m. on December 8, 2007, a police officer stopped an SUV because it rolled through a stop sign. Villalpando was the driver and was wearing a black baseball cap with an "F" on the front. Villalpando had a "Tokers Town" tattoo on the back of his head and an "FTTR" tattoo on his hand. Villalpando admitted he was an FTT gang member with the moniker, "Oso," for bear. He said FTT is the largest gang in Fullerton. Villalpando's vehicle was searched and no weapons were found. The officer gave Villalpando a STEP notice.[6] Also in the car were a woman and another man; neither were given STEP notices.

Sergeant Michael Chlebowski testified as a gang expert. The parties stipulated that FTT is a criminal street gang within the meaning of section 186.22. Chlebowski stated that the more violent and dangerous a gang is, the more respected it is and able to intimidate people, for example, from phoning the police. A person who talks to the police about crimes is considered a "rat" or a "snitch." A rat can "get severe beat downs," stabbed, or killed. They cannot go back to their neighborhoods or safely walk on the street. Gang members are aware of the pattern of criminal activity of their gang. Gang members talk or brag about it, even online.

Chlebowski opined that Villalpando was an active member of FTT on December 8, 2007. Villalpando has two monikers: "Junior" and "Oso." Villalpando has

---

[6] "STEP" is an acronym for the California "Street Terrorism Enforcement and Prevention" Act. (§ 186.20.) A STEP notice informs suspected individuals that law enforcement believes they associate with a criminal street gang.

7

more gang tattoos than any other current member of the gang. Villalpando received a STEP notice in 2004.

Chlebowski reviewed Villalpando's jail correspondence. In those letters, Villalpando referred to himself as Oso or Junior and included FTT symbols and drawings. Villalpando wrote to FTT members in other prisons and jails. He wrote about meeting young gang members and also wrote to one young member, demonstrating he is still active in the community, making contacts, and establishing himself as a "veterano" (an established older member and leader of the gang). A kite (a note passed between gang members) was confiscated from the jail containing a roll call ("a list of gang members within a certain section or module of the cell") on which Villalpando's name, booking number, gang moniker, and gang association was listed.

Villalpando was arrested in his mother's SUV, which has an "F" on the back window and contained many CD's marked with FTT identifying information and logos, as well as Villalpando's monikers. These CD's showed Villalpando still identified with FTT and considered himself a gang member.

Chlebowski was asked how the shooting of Zarate in the back by an active FTT member would benefit FTT. Chlebowski replied the shooting showed FTT is willing to be violent toward those who have wronged them or who refuse to hand over goods when robbed. As a result, the next person robbed by FTT would be more likely to hand over the money, so that FTT would benefit by getting drugs or money the members could share. "Robbing dope dealers" is common among gangs. The gangs believe that if a dealer is selling in a gang's claimed territory, the dealer must "kick back." Zarate's home was within two or three blocks of territory claimed by FTT.

On cross-examination, Chlebowski agreed that being a gang member is not per se illegal. Chlebowski also stated that gang members who are between 25 and 35 years old are not likely to be hanging out with teenage gang members. Older members may resort to violence to reestablish their status if challenged by younger members.

8

Thirty days before Zarate's murder, a Baker Street gang member with the moniker "Clever" was killed, possibly by FTT members. Zarate had witnessed the assault leading to the death of Clever.

*Convictions and Sentence*

A jury convicted Villalpando of first degree murder (count 1 — § 187, subd. (a)) and found true the special circumstances he committed the murder during the commission of an attempted robbery (§ 190.2, subd. (a)(17)(A)) and for a criminal street gang purpose (§ 190.2, subd. (a)(22)). The jury also convicted him of conspiracy to commit attempted robbery (count 2 — § 182, subd. (a)(1)); attempted robbery (count 3 — §§ 664, 211, 212.5, subd. (c)); and street terrorism (count 4 — § 186.22, subd. (a)). The jury found Villalpando committed counts 1, 2, and 3 to benefit a criminal street gang. (§ 186.22, subd. (b)(1).) The jury found *not* true the allegation Villalpando personally discharged a firearm causing death (§ 12022.53, subd. (d)) and the special circumstance he murdered to prevent witness testimony (§ 190.2, subd. (a)(10)).

Prior to sentencing, the court granted the People's motion to dismiss Villalpando's prior felony convictions. The court sentenced Villalpando to life in prison without possibility of parole on count 1, then imposed and stayed execution of sentence under section 654 for all other crimes and enhancements.

## DISCUSSION

*Villalpando's Conviction for Conspiracy to Commit Attempted Robbery Must Be Reversed*

Villalpando argues his conviction for conspiracy to commit attempted robbery should be reversed because no such crime exists in California. The Attorney General agrees. We reverse the convictions because conspiracy does not lie for the

commission of *attempted* crimes; i.e., perpetrators do not conspire to *fail* to accomplish a targeted offense.  (*People v. Iniguez* (2002) 96 Cal.App.4th 75, 77, 79.)  The error occurred because the verdict form read simply:  "We the Jury in the above-entitled action find the Defendant, RAUL VILLALPANDO, <u>GUILTY</u> of Violation of Section 182(a)(1) of the Penal code of the State of California (CONSPIRACY TO COMMIT A CRIME) as charged in Count 2 of the Information."  But count 2 of the information did not charge conspiracy to commit a robbery.  Rather, it charged the nonexistent crime of conspiracy "to commit the crime of ATTEMPT ROBBERY, in violation of Section 664-211/212.5(c) of the Penal Code."  Thus, Villapando was convicted of a nonexistent crime.

*Although Substantial Evidence Supports the Gang Enhancement and Gang Special Circumstance Findings, We Reverse Villalpando's Street Terrorism Conviction for Insufficient Evidentiary Support*

On appeal, Villalpando challenges the sufficiency of the evidence to sustain (1) his street terrorism conviction, (2) the jury's findings he committed counts 1 and 3 to benefit a criminal street gang,[7] and (3) the jury's special circumstance finding he committed murder for a criminal street gang purpose.  He argues there was no evidence he committed the offenses for any purpose other than personal gain.

The court denied Villalpando's section 1118.1 motion, made after the close of evidence, asking the court for a judgment of acquittal.  Under section 1118.1, the court on a defendant's motion "shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

"'The standard applied by a trial court in ruling upon a motion for judgment of acquittal pursuant to section 1118.1 is the same as the standard applied by an appellate

---

[7]     The jury's true finding on the gang enhancement to count 2 (conspiracy to commit attempted robbery) is not at issue, since we reverse the conviction on that count.

court in reviewing the sufficiency of the evidence to support a conviction, that is, "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged."'" (*People v. Stevens* (2007) 41 Cal.4th 182, 200.) "Under this standard, the court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses *substantial evidence* — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Cuevas* (1995) 12 Cal.4th 252, 260.) An appellate court "independently review[s] the trial court's ruling" (*People v. Harris* (2008) 43 Cal.4th 1269, 1286), but may set aside the ruling only if it clearly appears "that upon no hypothesis whatever is there sufficient substantial evidence to support it" (*People v. Redmond* (1969) 71 Cal.2d 745, 755).

*Section 186.22 and* Rodriguez

Section 186.22 contains two provisions relevant to this case — a substantive offense in subdivision (a) and a sentence enhancement in subdivision (b)(1). Section 186.22, subdivision (a) (section 186.22(a)) defines the crime of street terrorism and provides in relevant part: "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully *promotes, furthers, or assists in any felonious criminal conduct by members of that gang*, shall be punished . . . ." (Italics added.) Section 186.22, subdivision (b)(1) (§ 186.22(b)(1)) prescribes a sentence enhancement for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to *promote, further, or assist in any criminal conduct by gang members* . . . ." (Italics added.)

In *Rodriguez,* our Supreme Court interpreted section 186.22(a)'s phrase italicized above (the italicized phrase) — i.e., "'*promotes, furthers, or assists in any*

11

*felonious criminal conduct by members of that gang.*'" (*Rodriguez, supra,* 55 Cal.4th at p. 1128.) A divided Supreme Court held that under the plain meaning of this statutory language, an active gang participant does *not* violate section 186.22(a) by committing a felony while acting alone. (*Rodriguez,* at p. 1129 (plur. opn. of Corrigan, J.); *id.* at p. 1140 (conc. opn. of Baxter, J.).) But, although four Justices agreed that the crime of street terrorism requires at least two gang members acting in concert, the case did not produce a majority opinion. Justice Corrigan wrote for a three-justice plurality, Justice Baxter concurred separately, and Justice Kennard wrote a three-justice dissent.

Justice Corrigan's plurality opinion focused on both the statutory language *and* "potential due process concerns." (*Rodriguez, supra,* 55 Cal.4th at pp. 1132, 1133 (plur. opn. of Corrigan, J.).) Based on the statute's use of the plural noun "members" in the italicized phrase, the plurality concluded the "plain meaning of section 186.22(a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member."[8] (*Rodriguez,* at p. 1132 (plur. opn. of Corrigan, J.).) The plurality then discussed potential due process concerns, noting that section 186.22(a) "does *not* require that the underlying felony be gang related." (*Rodriguez,* at p. 1135 (plur. opn. of Corrigan, J.), italics added.) In the plurality's view, the Legislature "recognized the constitutional prohibition against punishing mere gang membership" and therefore required the felonious conduct (which need not be gang related) to be committed by gang members so as to provide a *nexus* between the criminal conduct and gang activity. (*Ibid.*)

The plurality summarized Justice Kennard's dissent as concluding that a *lone* perpetrator can promote gang members' felonious conduct by emboldening gang

---

[8]     A person who is not a gang member can violate section 186.22(a) if he or she is an active participant in the gang. (*Rodriguez, supra,* 55 Cal.4th at p. 1130 (plur. opn. of Corrigan, J.).)

12

members "to commit other, unspecified crimes in the future." (*Rodriguez*, *supra*, 55 Cal.4th at p. 1137 (plur. opn. of Corrigan, J.).) The plurality critiqued the dissent's view as being inconsistent with the court's "prior characterization of section 186.22(a) as requiring the promotion or furtherance of *specific conduct* of gang members and not inchoate future conduct," *and*, "[m]ore fundamentally," as eliminating the constitutionally required nexus between the defendant's felonious conduct and gang activity. (*Ibid.*) The plurality stated: "Under the dissent's view, all that would be required to satisfy [this] element of section 186.22(a) would be expert testimony that commission of a felony by a gang member *would* embolden other gang members to commit felonies." (*Ibid.*)

In dicta, the plurality discussed the gang enhancement established by section 186.22(b)(1).[9] In the plurality's view, although a lone gang member who commits a felony cannot be convicted of street terrorism, the lone perpetrator is subject to the harsher punishment prescribed by section 186.22(b)(1) in the form of a sentence enhancement. (*Rodriguez*, *supra*, 55 Cal.4th at p. 1139 (plur. opn. of Corrigan, J.).) The plurality observed that the enhancement, unlike the substantive offense, poses no due process concerns because the enhancement applies only to *gang-related offenses* and requires a defendant to act with the *specific intent* to promote, further, or assist any criminal conduct by gang members, thereby providing a nexus between the defendant's conduct and gang activity. (*Id.* at p. 1130, fn. 5 (plur. opn. of Corrigan, J.).)

Justice Baxter concurred in the plurality's conclusion that an active gang participant who commits a felony while acting alone is *not* guilty of the substantive offense of street terrorism under section 186.22(a). (*Rodriguez*, *supra*, 55 Cal.4th at p. 1139 (conc. opn. of Baxter, J.).) "However, unlike Justice Corrigan, [Justice Baxter]

---

[9] The gang enhancement was not at issue in *Rodriguez* because the trial court there granted the defendant's new trial motion as to the enhancement for insufficient evidentiary support. (*Rodriguez*, *supra*, 55 Cal.4th at p. 1129 (plur. opn. of Corrigan, J.).)

13

base[d his] conclusion solely on the plain meaning of the express statutory language." (*Id.* at pp. 1139-1140 (conc. opn. of Baxter, J.).) Justice Baxter emphasized, "No reference to other principles, authorities, or theories, including due process, is necessary to reach this conclusion. I therefore take no position on such matters." (*Id.* at p. 1141 (conc. opn. of Baxter, J.).) Justice Baxter agreed with the plurality that lone actors *are* subject to section 186.22(b)(1)'s sentence enhancement. (*Rodriguez*, at p. 1140 (conc. opn. of Baxter, J.).) In this respect, Justice Baxter recognized "that a seemingly similar reference to gang 'members' appears in both section 186.22(a) and section 186.22(b)(1)" (*ibid.*), but explained that section 186.22(b)(1)'s element of specific intent "merely describes a culpable *mental state*" (*Rodriguez,* at p. 1141 (conc. opn. of Baxter, J.)). Justice Baxter also noted that "nothing in section 186.22(b)(1) states or implies that the criminal conduct by gang members which the defendant intends to promote, further, or assist *is the same criminal conduct* underlying the felony conviction subject to enhancement." (*Ibid.*)

Because Justice Baxter concurred in the *Rodriguez* judgment on the narrowest grounds, his concurring opinion represents the *Rodriguez* holding. When a fragmented court decides a case and no single rationale explaining the result enjoys a majority assent, the court's holding may be viewed as the position concurring in the judgments on the narrowest grounds. (*Marks v. United States* (1977) 430 U.S. 188, 193.)

*Villalpando's Street Terrorism Conviction Must Be Reversed*

In our prior opinion, we rejected Villalpando's contention his street terrorism conviction must be reversed for insufficient evidence he acted in concert with another FTT member. We cited *People v. Sanchez* (2009) 179 Cal.App.4th 1297, 1308 and *People v. Salcido* (2007) 149 Cal.App.4th 356, 368, for the proposition that a

14

perpetrator of street terrorism need not act in concert with another gang member.[10] We recognized, however, that the issue was then pending review before our Supreme Court in *Rodriguez*. Now that our Supreme Court has held to the contrary in *Rodriguez*, we reverse Villalpando's street terrorism conviction for insufficient evidentiary support. There was no evidence Villapando acted in concert with another gang member. Warren was acquitted of street terrorism and the jury found *not* true all other allegations and special circumstances alleged against him. Accordingly, the Attorney General has acknowledged in her response to Villalpondo's motion to recall the remittitur that "the evidence . . . demonstrated that [Villalpando] was the only gang member in the commission of the offense."

> Rodriguez *Does Not Invalidate the Jury's Findings on the Gang Enhancements and Gang Special Circumstance*

Villalpando contends that although section 186.22(b)(1) and section 190.2, subdivision (a)(22) were not before the Supreme Court in *Rodriguez,* "the court, nevertheless, made it clear that to avoid due process concerns, defendants may not be punished for gang membership alone" and that "the element of furthering, promoting or benefiting the gang relates to 'specific conduct' and not to inchoate future conduct." Justice Baxter's opinion, however — which represents the *Rodriguez* holding — expressly declined to recognize any due process concerns with respect to section 186.22. Moreover, Justice Baxter and the plurality agreed, albeit in dicta, that a lone actor *is* subject to the section 186.22(b)(1) sentence enhancement.[11] Consequently, *Rodriguez*

---

[10] The *Rodriguez* plurality disapproved *People v. Sanchez, supra*, 179 Cal.App.4th 1297 and *People v. Salcido, supra*, 149 Cal.App.4th 356 to the extent they conflict with Justice Corrigan's plurality opinion. (*Rodriguez, supra*, 55 Cal.4th at p. 1137, fn. 8 (plur. opn. of Corrigan, J.).)

[11] Justice Baxter and the plurality's dicta represent the high court's considered reasoning on the issue. "When the Supreme Court has conducted a thorough analysis of

15

provides no basis for reversing the gang enhancements under section 186.22(b)(1) or the gang special circumstance under section 190.2, subdivision (a)(22) (which statute is never mentioned in *Rodriguez*). Accordingly, as discussed below, we affirm the jury's true findings on the gang special circumstance and gang enhancement allegations.[12]

---

the issues and such analysis reflects compelling logic, its dictum should be followed" (*Hubbard v. Superior Court* (1997) 66 Cal.App.4th 1163, 1169) unless inadvertent or ill-considered (*Jaramillo v. State of California* (1978) 81 Cal.App.3d 968, 971).

[12] We observe, however, that the *Rodriguez* plurality's confidence that the gang enhancement presents no potential due process concerns (of the type identified by the plurality with respect to the substantive offense) presupposes that section 186.22(b)(1)'s requirements of (1) a gang-related offense and (2) the defendant's specific intent to promote gang crime, will provide adequate safeguards to ensure that a nexus exists between the defendant's conduct and gang activity. As to the substantive offense, the plurality cautioned that expert testimony (that a gang member's criminal conduct emboldens other gang members to commit future felonies) is insufficient to show the required nexus. This rationale would seem to apply equally to the enhancement, and suggests that section 186.22(b)(1)'s dual requirements cannot be satisfied by a gang expert's opinion, standing alone, that the defendant's conduct, as presented in a hypothetical question, enhanced the gang's reputation for viciousness, intimidated people who might otherwise resist the gang, emboldened gang members to commit future felonies, or otherwise promoted inchoate future criminal conduct by the gang. (But see, *People v. Gardeley* (1996) 14 Cal.4th 605, 619 [based on gang expert's opinion, jury could reasonably conclude defendants' conduct "was committed 'for the benefit of, at the direction of, or in association with' that gang, and 'with the specific intent to promote, further, or assist in . . . criminal conduct by gang members'"]; *People v. Albillar* (2010) 51 Cal.4th 47, 63 (*Albillar*) ["Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section 186.22(b)(1)"]; *People v. Vang* (2011) 52 Cal.4th 1038, 1048 [expert can properly express opinion, based on hypothetical question tracking the evidence, that an "assault, if the jury found it in fact occurred, would have been for a gang purpose"].)

16

*Substantial Evidence Supports the Jury's True Finding on the Gang Special Circumstance*

As to Villalpando's special circumstance gang finding attached to count 1, the only disputed element as to the gang connection is whether he committed the murder "to further the activities of" FTT. (§ 190.2, subd. (a)(22).) "In common usage, . . . 'further' means to help the progress of . . . ." (*People v. Ngoun* (2001) 88 Cal.App.4th 432, 436.) Substantial evidence showed Villalpando acted with the specific intent of furthering FTT's activities by (1) enhancing the gang's reputation for violence and its ability to intimidate people, (2) preventing Zarate from further cooperating with law enforcement about a prior murder, and (3) deterring third parties in the future from cooperating with police or resisting a robbery by a gang member.

Chlebowski, the gang expert, testified that Villalpando's crimes enhanced FTT's reputation for viciousness. He also testified that, thirty days before Zarate's murder, a Baker Street gang member with the moniker "Clever" was killed, possibly by FTT members. Chlebowski further testified that a person can be labeled a "rat" or "snitch" for cooperating with police, even to help a member of their own gang against a rival gang. "[R]ats" are sometimes killed. They cannot go back to their neighborhoods and are afraid when they walk down the street.

There was evidence that in November 2007, Ashlee Pabon and Zarate were in a van in a Walgreens parking lot in Fullerton, when they saw a man Ashlee knew as "Clever" become embroiled in an argument and a brawl alone against four or five men. Pabon later learned that Clever had been killed. Paquette testified that Villalpando said he did not feel bad about killing Zarate (and failing to get drugs from him), because Zarate "was dirty anyways" since he was testifying against someone in a murder case. Curiel (Zarate's wife) testified that Zarate came home one night bruised and bleeding and said "he had been in a fight with cholos." After the fight, Zarate told his wife "that they

17

were going to kill him." He told his wife they had to move for the whole family's safety. He told her, "I'm dead."

But Villalpando argues the evidence does *not* show he committed the crimes with the specific intent of furthering the criminal conduct of gang members. He asserts he used no FTT indicia to claim FTT responsibility for the crime. Paquette, however, testified Villalpando said he was wearing a Fullerton cap at the time he shot Zarate and that Zarate would not have come out of the house if he had seen Villalpando there. Villalpando also points to Rubio's testimony Villalpando told him to say Eastside Buena Park committed the crime. The jurors, however, may have disbelieved this testimony by Rubio. A jury may reject some parts of a witness's testimony while accepting the remainder. (*People v. Nunez* (1983) 144 Cal.App.3d 697, 705.) Furthermore, if Villalpando sought to blame Eastside Buena Park for the crime and to take no credit for himself, it is unclear why he told Paquette that he (Villalpando) was an FTT member and shot Zarate. The gang expert testified that gang members talk or brag about their crimes.

Next, Villalpando points to the jury's finding he did *not* intentionally murder Zarate to prevent Zarate's "testimony in a criminal proceeding, as alleged in the Special Circumstance allegation pursuant to Penal Code Section 190.2[, subdivision] (a)(10)." But the information did not allege, nor did the jury address, whether the killing of Zarate was in retaliation for his *prior* cooperation with the police. Villalpando told Paquette that Zarate was already "dirty" at the time he was killed.

In sum, the evidence was sufficient to support the jury's finding that Zarate's murder was committed to further the activities of FTT, Villalpando's gang.

18

*Substantial Evidence Supports the Jury's True Findings on the Gang Enhancements*

As to Villalpando's gang enhancements attached to counts 1 and 3, the disputed elements are (1) whether he committed a felony "for the benefit of, at the direction of, or in association with" FTT, and (2) whether he did so "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22(b)(1).) "[T]he scienter requirement in section 186.22(b)(1) — i.e., 'the specific intent to . . . further . . . any criminal conduct by gang members' — is unambiguous and applies to *any* criminal conduct, without a further requirement that the conduct be 'apart from' the criminal conduct underlying the offense of conviction sought to be enhanced." (*Albillar*, *supra*, 51 Cal.4th at p. 66.) In contrast, the first prong of section 186.22(b)(1) — i.e., that the defendant be convicted of a felony committed for the benefit of, at the direction of, or in association with a criminal street gang — "requires proof that the defendant commit a gang-related crime" (*Albillar*, at p. 67), for example, a crime that benefits the gang (*id.* at p. 60). There "is rarely direct evidence that a crime was committed for the benefit of a gang." (*People v. Miranda* (2011) 192 Cal.App.4th 398, 411.) Thus, "[e]xpert opinion that particular criminal conduct *benefited* a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section186.22(b)(1)." (*Albillar*, at p. 63, italics added.)

Here, the second prong of section 186.22(b)(1) — that defendant committed the underlying crime with the specific intent to further criminal conduct by gang members — is supported by the same substantial evidence discussed above in connection with the special circumstance finding. And the first prong — that the felony was committed for the benefit of the gang — is easily satisfied. As also noted above, the gang expert opined that the shooting showed FTT is willing to be violent toward those who have wronged them or who refuse to hand over goods when robbed. As a result, the

next person who might think about cooperating with the police would be dissuaded from doing so, and the next person robbed by FTT would be more likely to hand over the money, so that FTT would benefit by getting drugs or money the members could share. "Robbing dope dealers" is common among gangs. The gangs believe that if a dealer is selling in their claimed territory, the dealer must "kick back," and Zarate's home was within two or three blocks of territory claimed by FTT. In short, in the opinion of the gang expert, crimes such as this enhance the gang's reputation for violence and its ability to intimidate people. Although Villalpando argues that no other participants in the incident were gang members and there was no evidence he or any of the other participants planned to share the proceeds with other people, this does not foreclose the implication that he would have shared the fruits of the robbery with FTT members had the crime been successful.

*Any Error in the Felony Murder Special Circumstance Instruction on Intent to Kill was Harmless*

The court did *not* instruct the jury that intent to kill is an element of the special circumstance of murder in the course of an attempted robbery.[13] The jury did not find it to be true that Villalpando personally discharged a firearm causing death (an enhancement alleged in the information with respect to counts 1 through 3). As a result, Villalpando moved the court to set aside the jury's verdict on the special circumstance of murder during the course of robbery or attempted robbery, or, alternatively, for a new trial, arguing that the jury's finding cast doubt on: (1) the prosecution's case, particularly on whether he intended to kill Zarate, and (2) the jury's special circumstance finding he killed Zarate for a gang purpose.

---

[13] As to special circumstances in general, the court instructed the jury with CALJIC No. 8.80.1 as follows: "If you find the defendant in this case guilty of murder of the first degree, you must then determine if one or more of the following special circumstances are true or not true: murder during the commission of an attempted

20

A trial court bears a sua sponte duty to instruct the jury on "'the general principles of law relevant to and governing the case.'" (*People v. Rubalcava* (2000) 23 Cal.4th 322, 333-334.) "'That obligation includes instructions on all of the elements of a charged offense'" (*ibid.*), as well as the elements of a special circumstance allegation (*People v. Williams* (1997) 16 Cal.4th 635, 689). With respect to a felony murder special circumstance, where evidence exists "'from which a jury could have based its verdict on an accomplice theory, the court err[s] in failing to instruct that the jury must find that defendant intended to aid another in the killing of a human being.'" (*People v. Jones*

robbery, murder committed for criminal street gang purpose, and murder to prevent testimony. [¶] . . . Unless an intent to kill is an element of a special circumstance, if you are satisfied beyond a reasonable doubt that the defendant actually killed a human being, you need not find that the defendant intended to kill in order to find the special circumstance to be true. . . [¶] You must decide separately each special circumstance alleged in this case. If you cannot agree as to all of the special circumstances, but can agree as to one or more of them, you must make your finding as to the one or more upon which you agree. . . ."

The instruction, as given, *omitted* the following paragraph from CALJIC No. 8.80.1's form language: "[If you find that a defendant was not the actual killer of a human being, [or if you are unable to decide whether the defendant was the actual killer or [an aider and abettor] [or] [co-conspirator],] you cannot find the special circumstance to be true [as to that defendant] unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill [aided,] [abetted,] [counseled,] [commanded,] [induced,] [solicited,] [requested,] [or] [assisted] any actor in the commission of the murder in the first degree] [.] [, or with reckless indifference to human life and as a major participant, [aided,] [abetted,] [counseled,] [commanded,] [induced,] [solicited,] [requested,] [or] [assisted] in the commission of the crime of (Penal Code, § 190.2(a)(17) crime) which resulted in the death of a human being . . . .]"

As to the special circumstance of felony murder, the trial court instructed the jury with CALJIC No. 8.81.17, as follows: "To find that the special circumstance referred to in these instructions as murder in the commission of a robbery is true, it must be proved: [¶] One, the murder was committed while the defendant was engaged in or was an accomplice in the commission or attempted commission of a robbery; and [¶] two, the murder was committed in order to carry out or advance the commission of the crime of robbery or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the attempted robbery was merely incidental to the commission of the murder."

21

(2003) 30 Cal.4th 1084, 1117.) A court also has a sua sponte duty to instruct on particular defenses "'if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.'" (*People v. Barton* (1995) 12 Cal.4th 186, 195.)

"'[A]ssertions of instructional error are reviewed de novo.'" (*People v. Lamer* (2003) 110 Cal.App.4th 1463, 1469.) A trial court's failure to instruct the jury on all elements of an offense is a constitutional error "subject to harmless error analysis under both the California and United States Constitutions." (*People v. Flood* (1998) 18 Cal.4th 470, 475.) Under the federal Constitution, the standard is whether the instructional error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18. (*Flood*, at p. 504.) "'Under that test, an error is harmless only when, beyond a reasonable doubt, it did not contribute to the verdict.'" (*People v. Jones*, *supra*, 30 Cal.4th at p. 1119.) Our Supreme Court has held that "'error in failing to instruct that a special circumstance contains a requirement of the intent to kill is harmless [beyond a reasonable doubt] when "the evidence of defendant's intent to kill . . . was overwhelming, and the jury could have had no reasonable doubt on that matter."'" (*People v. Marshall* (1997) 15 Cal.4th 1, 42.) In determining whether instructional error was harmless, a relevant inquiry is whether "the factual question posed by the omitted instruction necessarily was resolved adversely to the defendant under other, properly given instructions." (*Flood*, at p. 485.) A reviewing court considers "the specific language challenged, the instructions as a whole[, and] the jury's findings." (*People v. Cain* (1995) 10 Cal.4th 1, 36.)

The court denied Villalpando's new trial motion, stating: "In taking a look at CALJIC [No.] 8.80.1, I just think . . . the theory . . . that was advanced to the jury was that the defendant was the actual shooter. The portion [of] that instruction that deals with what if the jury finds the person not to be the shooter, but to be the aider and abettor, sets

out certain requirements, and . . . in taking a look at the portion that was not read, I just feel that that will defeat the special circumstances as to murder during the commission of a robbery. [¶] There was another special circumstance, that the murder was done intentionally and for a gang purpose, that I believe sufficient guidance was given to the jury as to, if he's an aider and abettor, did he have the intent to kill, and the jury found that to be true by their verdicts. [¶] So I'm going to deny the motion for new trial as it pertains to that particular special circumstance and deny the motion for new trial as to any other matter."

As to the special circumstance of intentional murder by an active gang member, the court had instructed the jury with CALJIC No. 8.81.22, as follows: "To find that the special circumstance, intentional killing by an active street gang member, is true, it must be proved: [¶] One, the defendant intentionally killed the victim . . . ."

The jury found true the special circumstance allegation that Villalpando intentionally committed murder for a criminal street gang purpose. Because the jury necessarily found Villalpando intentionally killed Zarate, we conclude that any instructional error with regard to the special circumstance of murder during the commission of an attempted robbery was harmless beyond a reasonable doubt. As Villalpando told Warren: "I told you, if he ran, I was going to blast him."

*Any Prosecutorial Misconduct was Harmless*

Villalpando argues the prosecutor committed misconduct by stating in her closing argument that the jury had heard testimony Warren was an FTT member. The parties agree that no such evidence was presented at trial.

In discussing the gang enhancement element requiring the defendant to have "committed the crime for the benefit of, or at the direction of, or in association with a criminal street gang," the prosecutor observed that all three clauses are "ors." "It doesn't have to be all three of those . . . ." "[Y]ou heard about how robberies benefit

23

FTT, and common sense tells you robberies benefit gangs. . . . [G]etting drugs and money helps a gang, helps those individuals within the gang, but it also benefits the gang because, again, the gang[’s] out there putting in work, these people are out there putting in work for their gang, and this gang continues to build its reputation of fear and violence in the community.” “[S]ometimes people do crimes together, and they are all in the same gang. Here you heard testimony that Michael Warren is FTT also. So you really could find just by being in association with him, this prong is proved as well. [¶] So there is a couple different ways of coming at that first element. Either how it benefits the gang or the fact that he was with Michael Warren.”

“‘The applicable federal and state standards regarding prosecutorial misconduct are well established. “‘A prosecutor’s . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct “so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.”’” [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves “‘“the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.”’”’” (*People v. Hill* (1998) 17 Cal.4th 800, 819.) Prosecutorial misconduct that violates the federal Constitution is reversible error unless the reviewing court finds beyond a reasonable doubt the misconduct did not affect the verdict. (*People v. Pigage* (2003) 112 Cal.App.4th 1359, 1375.) Misconduct under state law mandates reversal if there is a reasonable probability a result more favorable to the defendant would have occurred absent the error. (*Id.* at p. 1375). “[O]nly misconduct that prejudices a defendant requires reversal [citation], and a timely admonition from the court generally cures any harm.” (*Ibid.*)

Prosecutors "are held to an elevated standard of conduct" (*People v. Hill*, *supra*, 17 Cal.4th at p. 819), "'higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the state'" (*id.* at p. 820) and because jurors have a "'special regard . . . for the prosecutor'" (*People v. Bolton* (1979) 23 Cal. 3d 208, 213). Accordingly, a prosecutor is subject to limitations on the scope of closing argument and the method of presenting it. (5 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Criminal Trial, § 571, p. 815.) While a prosecutor "may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." (*Berger v. United States* (1935) 295 U.S. 78, 88.) Nonetheless, it "'is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.'" (*People v. Wharton* (1991) 53 Cal. 3d 522, 567.) "To be sure, a prosecutor may not go beyond the evidence in his argument to the jury. [Citations.] To do so may suggest the existence of 'facts' outside the record — a suggestion that is hard for a defendant to challenge and hence is unfair." (*People v. Benson* (1990) 52 Cal.3d 754, 794-795.) "'"[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."'" (*People v. Ayala* (2000) 23 Cal.4th 225, 284.) "In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) In addition, the prosecutor's

25

statements must be viewed "in the context of the argument as a whole." (*People v. Dennis* (1998) 17 Cal.4th 468, 522.)

We initially observe that Villalpando has forfeited this issue on appeal because his trial counsel failed to make a timely objection and because an admonition by the court to the jury would have cured the harm. (*People v. Parson* (2008) 44 Cal.4th 332, 359.) Even if Villalpando had preserved this claim, we would find no reversible error.

The prosecutor's two misstatements during closing argument — that the jury had heard testimony Warren was an FTT member and could find Villalpando committed the crime in association with an FTT member — did *not* establish a pattern of egregious, intemperate behavior constituting misconduct violative of the federal Constitution. Whether the behavior involved the use of a deceptive method to try to persuade the jury (so as to constitute prosecutorial misconduct under state law) is a closer question. But in any case, there is not a reasonable probability a result more favorable to the defendant would have occurred absent the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

Prior to counsels' closing arguments, the court instructed the jury: "Statements made by the attorneys during the trial are not evidence." (CALJIC No. 1.02.) "You must decide all questions of fact in this case from the evidence received in this trial and not from any other source." (CALJIC No. 1.03) "Evidence consists of the testimony of witnesses, writings, material objects, or anything presented to the senses and offered to prove the existence or nonexistence of a fact." (CALJIC No. 2.00) "The next part of the trial involves giving the attorneys an opportunity to comment as to the reasonable inferences to be drawn from the evidence that's been presented and as to the applicable law. [¶] It's not uncommon during any kind of litigation that counsel may disagree as to what the reasonable interpretations are, but I give both sides wide latitude to make comments in that area. I've given you the law that's to be applied to the facts.

We covered that yesterday. We ask you to apply the law as you understand it, so it's rare for me to sustain an objection between counsel during the course of argument, because I give them that much latitude, and I trust that you understand that this is argument, they are trying to persuade you to a particular conclusion. [¶] I want you to listen carefully to counsel and, in particular, what their basis [is] for their particular view, give that careful consideration, and obviously when you discuss the case with each other, you take that into account. But there is a distinction between counsel as efforts to persuade you and what is in evidence, and what counsel says is not evidence, and you have been advised about that."

Jurors are presumed to understand and follow the court's instructions. (*People v. Adcox* (1988) 47 Cal.3d 207, 253.) Moreover, the jurors themselves should have realized that they had heard no testimony Warren was an FTT member. Accordingly, there is not a "'"'reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'"'" (*People v. Ayala*, *supra*, 23 Cal.4th at p. 284.) Furthermore, the prosecutor's factual misstatements were brief and must be considered in the context of her entire argument. As discussed above, there was substantial evidence Villalpando committed the crimes for the benefit of FTT.

There was no prejudicial prosecutorial misconduct.

DISPOSITION

Villalpando's motion to recall the remittitur is granted. As to Villalpando only, we recall the remittitur, issue this new opinion that supersedes our prior opinion as to Villalpando only, and order that a new remittitur issue. Confirming our prior disposition, we strike Villalpando's conviction for conspiracy to commit attempted robbery (count 2). In addition, we strike Villalpando's conviction for street terrorism (count 4). In all other respects, we affirm the judgment against Villalpando. The trial

27

court is directed to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.



IKOLA, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


BEDSWORTH, J.